Good morning, everybody. I think it's still morning. We have one case left for today, for this panel. It's 22-4262, United States v. Parada. Mr. DeSimone. Thank you, Your Honor. May it please the Court, I am Andy DeSimone, and I represent Mr. Sandoval-Rodriguez, but today I'm arguing on behalf of all four appellants. This trial of four minority foreign-born defendants accused of horrific crimes was highly susceptible to discrimination against minority and foreign-born jurors, and we claim the government struck two jurors, jurors 217 and 138, because they were minorities and because one was foreign-born. And today I want to focus on all of the evidence of discrimination on this record, which discredited all of the government's excuses for striking these two jurors, leaving nothing but evidence of discrimination. So the government said it was concerned that juror 138 would not pay close attention because she did not answer three questions on her questionnaire. But the government accepted white juror 250, who wrote on her questionnaire that her loss of attention would interfere with her ability to be a fair and impartial juror. And she flat out said, I just don't focus a lot, I lose focus a lot, and, quote, it's a lot tough to remain focused for a long period of time. So the fact that the government accepted a white juror who obviously had trouble paying attention shows that its excuse for striking juror 138 was pretextual. I thought they said for 138 that part of the problem for them was that this lady had grandkids that she sat every day and that it would be very difficult for her to stay there weeks on end and that that would cause problems for her in the discharge of her duties. I don't think it was exclusively based on not answering a few questions. Correct, Judge Agee. But juror 138 unequivocally said there was regular care in place for her grandchildren. Meanwhile, white juror 59 was uncertain. Does that mean that even though she may have regular care, I mean, most of us up here have grandchildren. It's something that concerns you, and it may work good for a day or two, but if you're thinking about doing it weeks on end, that's a different situation. It may be. But, again, you know, well, one point is if the government was truly concerned about that, then it would have followed up with additional questions if that was a genuine concern. But instead it did not follow up with any questions. Can I ask you about this argument that you're making about pretext with respect to inattentiveness and comparing the struck juror with the one who was kept? Was that argument made below in the district court? That particular comparison was not drawn to the district court. So why would we even consider that now? For a few reasons, three. So there are three reasons why appellate courts must examine all the evidence of discrimination on the record, regardless of what was brought to the attention of the trial court. So first and foremost, because the Supreme Court tells us we have to. So in Snyder, the court held that all of the circumstances that bear upon the issue must be consulted, and the Snyder court explicitly addressed comparative juror arguments that were made for the first time on appeal. That's Snyder at pages 483 to 485. There's also footnote two of Miller L. The court explicitly rejected the dissent's call to find forfeited three arguments, the comparative juror arguments, the jury shuffle arguments, and the disparate questioning arguments, because the defendant did not make any of those below. The court said the evidence is what matters. If the evidence is in the record, we look at it. And then Miller L. was a habeas case, of course, where appellate review is generally more constrained. The Sixth Circuit in Atkins said that principle is even more true in the more permissive appellate posture of a direct appeal. Then this court followed Miller L. in Barnett, making it the settled law of this circuit. Even though the defense in Barnett had not made comparative juror arguments at the original Batson hearing, this court held that those arguments had to be considered on remand. That settled law continued through Foster, through Flowers, where the court repeatedly, over Justice Thomas' dissents as to preservation, addressed new arguments made for the first time on appeal. Second, we look at evidence, all available evidence, because eliminating discrimination is too important not to. Let me stop you for a moment. So you're saying that in a case where the focus of the juror concern with respect to 138 was the child care issue, not the question of inattentiveness, and the judge decided the issue based on the child care issue, which was, again, the focus of the defense concern to the extent that they raised the concern, that none of that matters? If you've got a new argument now with respect to inattentiveness and a comparative juror analysis, you can just, you know, take a pass on that in the district court and then raise it here. Is that what you're saying? Absolutely not. And let me just set the record straight here a little bit, because the judge did not accept the child care excuse. So the judge did not credit that. You're right, but that was the ‑‑ I mean, my point is that was the focus of the concern, and now you're raising an entirely different concern. Well, the government gave two reasons. Both are discredited. The district court did not accept them for purposes of disqualifying the juror for cause. I don't think that's the same thing as saying it's discredited when you're looking at the pretext. Well, also, let's set the record straight. The government never moved to strike either one of these jurors for cause. They didn't strike ‑‑ Well, they may not have, but if the district court felt that this was a characteristic of this particular juror that would prevent them from discharging their duties, he could have struck them for cause and he didn't. My point is that I don't think you can carry over a determination on cause, even if it's implied, to say that's almost an estoppel on the pretext issue. So let me point you to some language in Snyder. In Snyder itself, the court said, we recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, appellate courts must be mindful that an exploration of the alleged similarities at the trial have shown that jurors in question were not really comparable. In this case, however, the shared characteristic, i.e., concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause. The same goes here. These things that I'm pointing to were thoroughly evaluated by the district court in his questioning. So there's Juror 59. In terms of the child care excuse. It seems like the thrust of your position, maybe I'm overstating it, is that if there's not a basis to discharge for cause, then that's a prima facie evidence that there's pretext, at least in the spatsum context. There could be, right? I think it's a factor. So if the government had been genuinely concerned about Juror 217's ability to deliberate with other jurors, for example, it would have moved to strike that juror for cause. That's the mechanism for getting rid of that juror. You would not waste a peremptory challenge on such a juror. For example, a juror who was hard of hearing. The proper mechanism for getting rid of that juror would be a motion for cause. The fact that it did not hear speaks volumes, along with the fact that the court reporter, all defense counsel, and the judge could hear and understand Juror 217. Let me rephrase my question because maybe I didn't make it clear enough. I understood this record, and you can correct me if I'm wrong, as showing that with respect to Juror 138, the defense never made an argument that the government's rationale for striking the juror was actually a pretext for discrimination. Do I have that wrong? Yes, because the way it went was there was the prima facie case. There was the government's reasons. Then the judge immediately asked both counsel, was there colloquy in terms of arrangements for these children? The defense says yes. The government says no. The court says let me check my notes, checks with his clerk. Yes, there was. Then the judge goes right into the ruling and says, I do not credit the child care reason because our notes indicate that the grandfather was available, but I do credit the failure to answer the questions shows a lack of attention. The defense really didn't even have an opportunity, but the argument that the notes that the grandfather was available is an argument that that excuse is pretextual. That is an argument. So there is no magic word requirement in Batson that you use the word pretextual. The whole point of the Batson objection was that this was pretext for intentional discrimination. Well, it seems like you're back to what we discussed before, that in effect denial for cause is prima facie proof of pretext. It can be. And I think on this record, if you look at it in conjunction with everything else that's going on, it was. So juror 59, for example, was uncertain whether he would be able to find care for his wife during her recovery after a scheduled knee replacement, but the government accepted him. That comparison also shows the government's child care excuse was pretextual. The government misstated the record of juror 217's voir dire. Now, the government concedes it was wrong to claim it moved to strike juror 217 for cause because it didn't. Now, the government also claims in its brief that it could not be sure that the other jurors would take the time necessary to understand juror 217's accent, but the government was okay with other jurors having to take extra time to ensure that white juror 250 understood everything. Let me point you to joint appendix page 627. So in denying the defense motion to cause motion to strike juror 250 for cause, the district court said, quote, her reactions and responses were not as immediate, maybe not as sharp as was true with some of our other potential jurors, but really with just a minimum of additional follow-up and prompting from the court and a little bit of additional effort to explain a question or concept, the juror was able to comprehend and understand, et cetera. That inconsistency. That's the explanation for rejecting the challenge for cause, but then you've got to deal with the basis for peremptory challenge where the court said with respect to juror 217, if I have the number correct, that, you know, I don't necessarily agree with the government. I think that with some effort I was able to finally understand that particular juror, but I don't find that explanation ridiculous or I guess I don't find it to be a pretext. It's a different test. Don't you agree? I mean, as long as the court finds that the government wasn't acting with an ill motive, a discriminatory motive, you know, you can argue about whether or not peremptory challenges are a good thing. Frankly, I think they're likely not precisely because we have to deal with these issues. But if we have them and if the government can show that notwithstanding the court's disagreement or the fact that another juror was not challenged for cause was not granted, if they can show that in their mind, in good faith, they don't think that this juror would be ideal in part because they think that he might have a difficult time engaging with the other jurors and vice versa, if that's a legitimate rationale, how can that possibly be an abuse of discretion for the judge to grant the challenge? But here the district court did not credit the factual underpinning of the government's reason, only reason, for striking juror 217, his accent. That is more evidence under St. Mary's versus Hicks. That's evidence when the district court discredits one of the reasons, same for 138. And the accent excuse itself here, it's important to recognize, is direct evidence. This is not just purely a circumstantial evidence case that we're building. That is direct evidence of discrimination. The Sixth Circuit in Enri Rodriguez held that an employer's comments about an employee's accents are direct evidence of national origin discrimination. And the same goes here. Are you focusing on 138 or 217? Both. It looks like you're sort of going with both. I think you have to separate those two. And I'll tell you, I've been looking at Batson challenges for over 30 years as an appellate judge. There are all kinds of reasons that are given by prosecutors, and rarely, if ever, have I seen one like this not being allowed. But I think you have to talk about these two jurors separately, because they're two separate things. One's on the national origin. The other one, you're dealing with it from probably a race-based situation. 138, if I had to pick, it sounds like to me is probably the weaker of the two arguments you could make on this. And the reason I say it is she didn't answer the questions. And maybe it's reasonable for a prosecutor to ask that you didn't answer three of the questions here. Even with the child care, which the court sort of dabbed into, you know, she has to take care of them all week long or something. And, I mean, yeah, a husband can babysit at times, but it may be a concern, you know, how much you're going to be there. But in any event, I think you need, I would suggest, it seems to me, you need to address these separately. They don't, in other words, you don't, you can't lump them all together, because you're sliding back from one to the other. And it's, frankly, it's confusing me, because I think your basis has to be for each juror. You've got to stand on that. And could I have a little leeway to respond? I know I'm out of time.  Go ahead. Thank you, Judge. Well, neither strike can be reviewed in isolation, I think, because of Snyder, right? Snyder says protectural reasons for striking one juror are probative as to the other. And so that's why I am bouncing back and forth a little bit. But I also want to make it clear that race is a basis for both jurors. You know, with the accent, this is a black Nigerian man's accent, so race is necessarily involved here. So I do want to just make clear that this is both race and national origin as to 217. Prosecutors state the reason because they had a Nigerian accent or it was a strong accent? It was an accent that was strong. It happened to be a Nigerian accent. It happened to be, but it wasn't his reason for giving it. And I'm wondering, you know, I've heard many accents. Sometimes a southern accent can throw me off. And how is that different if you say I can't understand because of the accent? But I didn't hear the word Nigerian on it, which, you know, brings it in national origin. I mean, contextually, yeah, we know who he is and what's there, but that's not the reason he gave. Unlike the cases where you had the Hispanic cases, they gave that reason. He had a Hispanic accent on it. Courts have said, no, you can't do that because it seems to discriminate based upon the national origin, that he has an accent of that. But a strong accent is, this guy's been around in the United States for 25 years. He had all kinds of degrees. He's smart as all can get out. I mean, I don't know what his accent sounded like. Could have been more, I would probably say probably more British than it was anything else. And it could be difficult, but the court did at some point say he could understand them. I mean, it may have taken a little work to do it. So, you know, I'm just trying to follow in terms of if your basis is national origin, to what extent do we rely on what the prosecutor actually said, as opposed to what the record reveals about him outside of that. Right. I just don't think we can ignore the fact that it was a Nigerian accent in this situation. I think there could be situations where an accent, whatever it may be, maybe a southern accent is too difficult, and that could be the reason. But here there's an entanglement, and this is all the scholarship we cited in the briefs. There's an entanglement. And, you know, especially when you look at the employment discrimination cases, they're really instructive as to looking to accent. I just want to make sure, because I think that's a distinction. You cannot ignore the fact it was a Nigerian accent. There's evidence he was Nigerian. There's evidence he has a strong accent. How does that add up to the conclusion it's a Nigerian accent? Well, the defense argued that it was a Nigerian. But I'm talking about in terms of you focus on the reason that's given here, and you say it's pretextual. But if it's a strong accent there, and I got it, you know, more likely it could be a Nigerian accent, but that's different from some. A lot of people have strong accents. It doesn't matter where you're from. That's not a national origin. A strong accent doesn't necessarily refer to a national origin. Agree? Correct. Because you need to know, you know, what kind of accent, and here the record reflects that it was because he was Nigerian. I don't want to abuse my privilege here. Thank you, Your Honor. Mr. Smolkin. Thank you, Your Honor. Good morning. May it please the Court. Anatoly Smolkin on behalf of the United States. After presiding over four days of jury deliberation in this case, observing each prospective juror and all of the lawyers in the courtroom, the district court made factual findings and credibility determinations. You've got two situations here. You've got two jurors, 217 and 138. And I don't know about my colleagues, but I think we could just deal with the issue here in this case, which is were they properly struck the refugee challenges, or was this pretextual? And I think I agree. I think it should be separated. I think you've got to look at that 217, because I think that looks to me as pointing to national origin, and you heard my colloquy in terms of is this because he's Nigerian. Would you not agree that if the prosecutor has said he has a strong Nigerian accent, that is probably violated? Would you agree? I think that if that were the only basis given, if the basis was, and this is not the case here, Your Honor, but if the basis was the prospective juror has a strong Nigerian accent or a strong foreign accent, and for that reason we don't want that person to serve on the jury, then that's a problem. That means everybody with a strong accent from Nigeria couldn't serve, wouldn't it? Because if that's the basis, it'd be a basis to strike anybody as that. If it were a basis, then sure, it could be applied across the board. But I think that it's important to focus in on the specifics here, which was not that his accent existed, but that his speech was extremely difficult to understand. And whether that's by virtue of his accent or some other reason, the government's basis was the difficulty in understanding the way that he spoke. It was not because of his accent. It was he spoke in a manner in which . . . Which would go to this juror's ability to interact with the other jurors and whether or not they would be able to discharge their duties in conjunction with him if they couldn't understand it. That's exactly right, Your Honor. I think that serving on a jury certainly has the component of receiving the evidence, right? Hearing the evidence and understanding it and digesting it. But obviously a very important secondary component, arguably more important, is deliberating. Going back to the jury room and interacting with your colleagues about what the evidence showed, what the evidence didn't show, and whether the government has carried its burden beyond a reasonable doubt. It's really hard to believe this man couldn't interact. I mean, he'd been here 25 years. He has degrees, nuclear-type degrees, all kinds of stuff. I mean, it just seems like if he could function in this country for 25 years, he could talk to people. I mean, maybe that's the basis of it. But I think when you're giving a reason by the prosecutor, and what I've seen over the years, it looks like he can just about say anything in some of these cases that I've seen come up. But in this particular instance, it would seem there are cases that are dealing specifically, and the ones I've seen have been mostly on Hispanic, where you do not want to strike him simply because they sound Hispanic or they sound Nigerian. That seems offensive. But to say he has a strong accent, I can see your point. In other words, that he wasn't easy to understand. And the question is, is that sufficient as a reason? So is this not pretextual? It doesn't mean it's a good reason. It's just not pretextual. It means, yeah. And what you probably can point to is the number of times the judge had to keep asking. That might be helpful. Your Honor, that's exactly where I was going to go next. You know, there are sort of two points in the voir dire colloquy that we should focus on. The first point was prior to the district court asking the juror to move closer to the microphone. That took up less than a page of transcript. And during that exchange, the district court needed five separate times to repeat or clarify what the juror said. So then the court asked, please move so that your mouth is one inch from that microphone. And for the next several minutes, there were 29 separate times where the district court needed to repeat, confirm, or ask a clarifying question. Well, he did have a mask on. He did have the mask on because he hadn't taken the COVID vaccine. So he had to wear that mask. And I can imagine that's really difficult to hear. I don't get what Jackson is. He did have a mask on, Your Honor. And I think that there were certainly other jurors who wore masks during the course of voir dire. And the defense certainly points out that there were a few interactions with the district court where the judge said, please repeat that, or I didn't quite understand you, with other jurors. But nowhere comes close. None of those other interactions come close to the 29 separate times that the judge needed to clarify or repeat Juror 217. And I'll point the court to just a couple of examples here. One was Joint Appendix 554 through 555. The court was asking about the juror's children. He said, are they still at home with you? The juror said, no, they're in college. The court said, I'm sorry. The juror said, they're in college. And the court had to confirm they're in college. Then when Juror 217 was explaining that he used to work in Randallstown for a I worked at, say that again, please. The juror said, Jackson Hewitt, the tax, to which the court responded, taxi. And then there was a further exchange during which the court needed to clarify exactly what the juror was talking about. So I think that to the extent the appellants argue that the record doesn't support the government's observations, the record absolutely supports it. Not only that, but the court actually made observations consistent with difficulty to understand this juror. The court said at Joint Appendix 560, I have had some difficulty understanding him as he spoke with his accent. But with some patience and clarification, I think it's all come through. Then at Joint Appendix 1416, the court says, I didn't detect a hint of a problem with his actual use of the language once I could penetrate the accent and understand it. And then at Joint Appendix 1418, the court indicates that he could understand the juror, particularly if I was prepared to make an effort to really try to listen to him. So I think that these observations by the district court in overruling the Batson challenge go exactly to the heart of what the record shows here. The record shows that, in fact, there were difficulties here. There was a problem with understandability. And, again, it's not because he had an accent that he was excused with a preemptory challenge. It was because of the concern about his ability to effectively deliberate with his fellow jurors, which is a valid and legitimate basis, of course, for the government. It's a valid basis that the government has to strike a juror with a preemptory challenge. I want to touch on something that Judge Agee brought up with respect to this distinction between a cause challenge and a preemptory challenge. There were moments where the district court, and this is highlighting what the defense calls essentially a disagreement with the record or, I'm sorry, with the record, rejected the government's interpretation. I think what the court was doing was he said, I disagree with the government in terms of his suitability for jury service. That's a cause-type analysis, whether someone is suitable, whether someone is qualified to serve on a jury. So the district court believed he was qualified, certainly. And he disagreed that the language, the understandability was so problematic that it would disqualify him from service. That's on the one hand from a cause analysis. On the other hand, there's a preemptory analysis, which is much different. And so as long as there's a legitimate, nondiscriminatory basis, the government is entitled to exercise its preemptories. And the judge here found that the motivation behind the preemptory challenges had nothing to do with race, nothing to do with national origin. The court found that the concerns were genuine, valid, and not rooted in these factors that the appellants now claim were all over the record in this case. And I think that goes to a point that Chief Judge Diaz brought up, which is, should this court even engage in this type of analysis, given that the arguments were not raised below? And I want to make a couple of points in that regard. I think, first and foremost, to the extent that the record is fully developed on these particular issues, the court can engage in some of this analysis. That's what the case law says. Now, the Fourth Circuit does say that failure to argue a specific basis for pretext may constitute a waiver of the ability to make that argument on appeal. That was United States v. Chapman, which is an unpublished decision from 2006. There's also United States v. Bell, another unpublished opinion from 2013 of this court, that holds that a defendant is required to identify comparative jurors below in the district court as a condition of raising the argument on appeal. So I just want to say there's very good reasons for that general principle, and that is that if you fail to argue below, for example, a comparative juror type analysis, it prevents the government from creating a record explaining either why the jurors were not similarly situated, as is now being claimed on appeal, or why the jurors were treated differently but for permissible reasons. So I think that Juror 89 is a perfect example. And the appellants don't argue about Juror 89 anymore because after their opening brief, I gather they realized that there wasn't this discrepancy. But the claimed discrepancy was that Juror 89 also missed several questions on his answer sheet. The factual record, as we've explained in our brief, does not bear that out. He did not miss any of the questions. But the point I'm trying to make is, had that argument been raised below, the district court would have simply picked up Juror 89's answer sheet, would have looked and confirmed, in fact, Juror 89 answered every single question, and he was not a comparable juror for this type of analysis. You cited two unpublished decisions from our court with respect to this requirement of preservation. But your colleague on the other side rattled off a number of Supreme Court cases and other cases that seem to suggest that, at least in this context, the courts are not so concerned about strict preservation so long as there is sufficient information in the record to consider the issue. So do you disagree with his characterization of those cases? No. I think there's a distinction with several of those cases, Your Honor. First, with respect to Miller L. in particular, that was the case that established for the first time that comparative juror analysis should be considered at all. So it makes sense that it wasn't argued below, but then was permitted to be argued above once the Supreme Court ruled that it's a valid basis or a valid tool for courts to use in wrestling with this analysis. I think Barnett was in the same boat. The Barnett case, the original Batson hearing was before comparative juror analysis was permitted by the Supreme Court in Miller L. And so on remand, this court authorized or instructed the district court to consider that argument below, which makes perfect sense. I guess what I'm trying to drive at, Your Honor, is that this Court's not prohibited from considering these issues only if they've been fully developed below. Obviously, the best way to fully develop an argument below is to make the argument below, which did not happen here. But the cases, and I'll refer to United States court. When you say that did not happen here, are you saying it did not happen with respect to both jurors or juror 138 or 217? So what I'm saying, Your Honor, is that a number of the arguments being made on appeal were not raised below, and so the record as to those arguments were not. Well, let me focus on 138 because my understanding of juror 138 is that the whole focus was on the child care issue, and the judge resolved that issue and then moved on, and no one raised any kind of contention that there was some pretext on the part of government in striking the juror. Do I have that right? That's exactly right. So is that forfeited? I think it is. Okay. That's forfeited under this court's decision in Davis v. Baltimore Gas and Electric. And that goes beyond just the failure to make particularized pretext arguments below. That was just a complete failure to argue any pretext, to argue that the government's stated basis was masking discrimination, which is the burden ultimately that the defense has to carry to sustain a Batson violation. So with respect to juror 138, the government's primary reason, of course, was the failure of this juror to answer three questions on her questionnaire, and also that while the court walked her through those answers, she displayed a lack of interest in the process or a concern about the questionnaire. That was our primary focus. And when the court said, well, remind me of who this juror is, he said, help me remember who she is. Perhaps describe her job or her situation. That's where the child care colloquy came from. So it was a secondary basis that the government relied on, but primarily the basis for striking juror 138 was the lack of answers on her answer sheet and her general disinterest in the process when the court walked her through those answers. And even if we were to consider that issue, I guess, to the extent that other jurors may have failed to answer questions, you may dispute that on the questionnaire, but is there any indication in the record that they exhibited the similar indifference or lack of interest that you, somebody, maybe not you, but the government highlighted in the district court? Not at all, Your Honor. There was only one other juror who missed any questions, and she was ultimately seated as one of the alternates. This was juror number 454. Her voir dire is at joint appendix 1343. And in her case, when the district judge brought to her attention the fact that she missed one or two questions, it was as if she was mortified. She said, I'm so sorry, I didn't realize. And she engaged with the court. She interacted with the court in a way that you would expect someone to interact who is engaged in the process and who is not demonstrating a disinterest in being potentially seated as a juror. And this particular juror was actually a black female that the government did not strike, the defense did not strike her. But when you look at the joint appendix, it speaks volumes in terms of just what her reaction was when sort of confronted with the fact that she missed a couple of questions. There are no other jurors who stand in that position either. I just want to make a couple of additional points. So with respect to these waiver and sort of procedural arguments that we've made, I just want to be clear, we're not hiding behind those arguments to say that the court, if it delves deeper and examines the merits, that there's going to be some problem. So I'll take on these specific comparative juror analyses that are raised for the first time on appeal. I'll start with Juror 59, who was the individual whose wife was scheduled to have knee surgery. The colloquy in that regard was that he would need someone for a couple of days to potentially help take care of his wife while she recovered from outpatient surgery. This is much different than jurors. Is this a comparison to 138? It is, Your Honor. I apologize. And in fact, Juror 59, when asked if he would be able to get someone to cover, he said, I feel pretty confident we could find somebody. Again, this was a short, potential short period of time here as compared to Juror 138. I've already discussed Juror 89, who did answer all of his questions on the answer sheet. And then Juror 250, which the defense spends a little time on. The argument there is that I guess if the government was so concerned with inattention, it would have struck Juror 250. Well, there are several reasons why Juror 250 was not struck. The first was she was fully engaged with the district court during her voir dire, unlike Juror 138. She also confirmed after further questioning that she doesn't think her difficulty focusing was any different, really, than anyone else, and that she wouldn't be worried about her ability to focus during the trial. And also, and perhaps most importantly, the defense unsuccessfully moved to strike her for cause. So when deciding what peremptory challenges to exercise, the government knew that the defense was likely going to use one of its peremptories to challenge Juror 250. And so for that reason, we wouldn't have needed to use a peremptory to make that challenge. I'll also point out that the defense argues that if we were concerned, and now I'm shifting to Juror 217, the individual who was difficult to understand, the defense points out that we would have moved to strike him for cause if we really had difficulty understanding him. And I would just point the court to page 560 of the joint appendix. It's at that point where the government asks the judge to ask a few follow-up questions to explore his sort of language skills just to see what else can be learned. And the court says, well, I'm not really sure it's going to reveal anything. And he says, the judge says, I've had some difficulty understanding him as he spoke with his accent, but with some patience and clarification, I think it's all come through. And then this is important. The judge says, so I think that is what it is, and I don't find that to be disqualifying. So effectively, the district judge has ruled on a cause-type challenge. He's ruled that it's not a disqualifying factor. There's no reason at that point for the government to come in and say, well, judge, to be clear, we moved for cause. When the district court has already essentially ruled that that challenge would not be well taken. I'll also point out, Your Honors, that even the defense got it wrong in terms of what Juror 217 said during his interaction with the court. This is at Joint Appendix 1417 where one of the defense attorneys had said that Juror 217 lived in Manhattan for four years. Well, the juror said he lived in Baltimore City for four years. There's no mention of Manhattan at all. He also said that the juror lived in Randallstown for 13 years. There's a colloquy where the court clarifies, was it 13 or 14? They ultimately land on 14. But defense counsel thought it was 13. And then finally, defense counsel says that this juror had four children, and their ages were 26, 33, 18, and 17. But what the juror said was they were 26, 23, 18, and 17. I bring this to the Court's attention just to address this argument that the defense has made that the record is devoid of factual support for the government's  I think the record is replete with support here that the juror was difficult to understand and that the government's basis for its strike was well taken. And I just want to sort of bring it back here. I'm sorry, Your Honor. For a moment there, I thought you were going to argue and maybe tell me if this is an argument that you support. And that is that those misstatements also suggest that anyone can make a slip of the tongue in the heat of battle when it comes to selecting jurors because I understood that to be an argument as well, that the government misrepresented a number of facts throughout the proceedings regarding what jurors said or didn't say. So do you think that's relevant, that it can happen to anyone? I certainly think it can happen to anyone, Your Honor, that in the heat of battle, like Your Honor just said, that there can be a slip of the tongue. I think to address the specific argument that the government misstated numerous facts, I think that's not supported by the record. The only misstatement which we acknowledged was that we didn't actually move to strike juror 217 for cause and we mistakenly thought we had. And I think the representation was, I think we had an extensive discussion on a strike for cause with this juror. That turned out not to be the case, but as I've just explained, the court essentially took on a cause-type analysis. So I appreciate Your Honor's point that it could have been a slip of the tongue, but also in this context where the government is being accused of racial and national origin discrimination in the selection of a jury and when our basis goes to the very heart of understandability of this juror, I think it's relevant that the defense, in arguing their Batson challenge, was not able to understand that juror perfectly even though they claimed that they could. And I know that I'm just a bit over time. If I may briefly conclude, Your Honors. Go ahead. I would just like to kind of bring it back to what Batson is getting at. And it's getting at purposeful racial and national origin discrimination. And here there's deference owed to the trial judge who sat through four days of jury selection, observed the demeanor of all the lawyers in the room, and made credibility determinations and concluded that there was no racial or national origin animus in the government's strikes. This court held in Evans v. Smith that those credibility findings are owed great deference on appeal. I think that given where we are with a clear error standard, the facts that the appellants have tried to marshal here simply don't rise to the level of showing that the district court clearly erred in these factual findings and these credibility determinations. So unless Your Honors have any other questions, I'm happy to sit down. Thank you very much. Thank you. Thank you, Your Honors. As to Juror 138. Let me ask you before you get started.  You did not discuss the 11-person jury argument earlier, I don't think. No. We're relying on our brief on that.  Davis v. Baltimore Gas as to Juror 138 is absolutely distinguishable. In that case, in Davis, the district court did not make a Step 3 ruling. Here the district court did. Also, the defense argument about the grandfather was an argument about pretext. The defense did not stand mute like in Davis. Then there's also the fact that Davis predates Miller L., Snyder, Barnett, and all of the Supreme Court's bats and jurisprudence. I also want to point out that two of the questions that Juror 138 missed were actually conditional, and the condition didn't apply to her. If you look at it carefully, they asked, if you have previously served as a juror, would that experience affect your ability? She didn't answer them because she'd never served on a jury. She's actually being quite careful with the wording of the actual question. I also want to talk about the two other reasons for why this court looks at everything on appeal. One example is Peña Rodriguez v. Colorado as just one example, where the Supreme Court said there's an exception to the no impeachment rule for jury deliberations when it comes to racial bias. It's just discrimination is different. Third, Yee v. City of Escondido and all of its progeny. In Yee, the Supreme Court held that once a party has properly presented a federal claim, quote, a party can make any argument in support of that claim. Parties are not limited to the precise arguments they made below. And this court followed that in Ortiz-Oriana, Henderson, Robinson, all cited in our brief. I also wanted to read just one other juror. There are several, but I just wanted to read one other juror's colloquy to show how similar it was to Juror 217's. This is from Joint Appendix page 785 and 786. My friend Brianna was murdered, the court. Now, I can't quite hear what you're saying. Prospective juror, I'm sorry. My friend Brianna was murdered two years ago, the court. Your friend Brianna was murdered two years ago. Where did that happen? Prospective juror, in the city, the court. In Baltimore City? The prospective juror, yes, sir, court. And do you know, prospective juror, she was coming home from work from the bus stop, the court. She was coming home from the bus stop. Prospective juror, uh-huh, court. Do you know anything about the circumstances beyond that? I know that she was stabbed, the court. She was set up? Prospective juror, stabbed, court. She was stabbed? Prospective juror, uh-huh, court. Okay, do you know what part of town it happened in? Prospective juror, Park Heights? Court, in Park Heights. This was the M.O. of this judge to make sure that he was understanding jurors. Because of all the obstacles to understanding. Masks, plexiglass. Did Judge Bredar make an affirmative statement as to this juror and difficulty understanding as he did with Juror 217? Yes, that's actually riddled throughout multiple jurors. And in one instance, the judge not only says, get to two inches, he says, put your microphone. And that actually is, there are multiple places in the record, if you look. They're there. I do want to briefly touch upon the probabilistic nature of a Batson claim. You know, a party doesn't have to prove intentional discrimination beyond a reasonable doubt. A party doesn't have to prove it by clear and convincing evidence. A party has to prove it by a preponderance. In other words, a 51% chance that the government strike was motivated in substantial part by discriminatory intent. Now, substantial part is another probabilistic aspect to the standard. So, putting it all together, a finding of discrimination under Batson is really a finding that the risk of discrimination is just too high to be tolerated. No one has to be labeled a racist to win a Batson claim. But just to conclude, at the end of the day, this case really comes down to whether after reviewing everything, you firmly believe a mistake was made and these two jurors should have been allowed to serve. Both were willing and able to be fair and impartial jurors. Juror 217, a naturalized citizen, drove two hours a day for four days, showing up early every day for COVID testing. They should have been allowed to serve. And because the district court denied them that right and duty of citizenship, appellants must receive a new trial. Thank you. Thank you very much. I want to thank both arguments, both counsel for their fine arguments. We'll come down and greet you and adjourn court for the day.
judges: Albert Diaz, G. Steven Agee, James Andrew Wynn